IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CINDY M. MERTLE, | ) | Case No. 3:24-CV-00832-JJH |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Cindy Mertle ("Mertle"), seeks judicial review of the final decision of the
Commissioner of Social Security, denying her application for disability insurance benefits
("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C.
§§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ")
applied proper legal standards in her consideration of Dr. Trask's opinion, I recommend that the
Commissioner's final decision denying Mertle's application for DIB be affirmed.

## II.      Procedural History

Mertle filed for DIB on March 10, 2022, alleging a disability onset date of September 15,
2021. (Tr. 182). Her claim was denied initially and on reconsideration. (Tr. 91-94, 101-04). She
then requested a hearing before an Administrative Law Judge. (Tr. 110-11). Mertle (represented
by counsel) and a vocational expert ("VE") testified before the ALJ on January 10, 2023. (Tr.
35-63). On May 24, 2023, the ALJ issued a written decision finding Mertle not disabled. (Tr. 17-

30). The Appeals Council denied her request for review on March 19, 2024, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). Mertle timely filed this action on May 9, 2024. (ECF Doc. 1).

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Mertle was 52 years old on the date last insured, making her an individual closely approaching advanced age according to Agency regulations. (*See* Tr. 28). She graduated from high school. (*See id.*). In the past, she worked as a home attendant and a cashier/checker. (*Id.*).

### B.    Relevant Medical Evidence

On September 15, 2021, Mertle was diagnosed with COVID-19 and treated with a seven-day course of dexamethasone and instructed to quarantine. (Tr. 343). She was prescribed prednisone and azithromycin by her primary care physician ("PCP") on September 20, 2021. (Tr. 309, 918-21).

On September 28, 2021, Mertle presented to the emergency department with shortness of breath, weakness, headaches, and progressive worsening of her symptoms. (Tr. 309-10). On mental status examination, she was alert and oriented and answered questions readily and appropriately. (Tr. 311). She was unable to walk even a short distance without resting. (Tr. 318). Her oxygen saturation was 87% on room air and increased to 92% when provided with two liters of oxygen via nasal cannula. (Tr. 312). A chest CT revealed diffuse pneumonia throughout both lungs. (Tr. 322). She was assessed as having acute respiratory failure due to COVID-19 and was started on steroids and continued on supplemental oxygen. (Tr. 320). She was transferred to St. Rita's hospital for continued care. (Tr. 312). Mertle received COVID-19 therapies while at St. Rita's, including oxygen supplement and Decadron. (Tr. 1072). She was gradually weaned off of

2

supplemental oxygen prior to discharge, although she still required two liters of oxygen with exercise. (*Id.*). Mertle was discharged on September 30, 2021, with home oxygen and an inhaler. (Tr. 1072, 1074). On discharge, she was alert and oriented, with appropriate thought content and normal insight. (Tr. 1073).

Mertle presented to the emergency department on October 11, 2021, for evaluation of leg pain. (Tr. 303). She described the pain as coolness and numbing in her anterior thigh, with symptoms worsened with ambulation. (*Id.*). Deep vein thrombosis or muscle strain were suspected. (Tr. 306). No evidence of deep vein thrombosis was found on ultrasound and Mertle was discharged in stable condition. (Tr. 306-07).

On October 14, 2021, Mertle presented for behavioral health follow up with Michelle Monfort, LISW to treat her depression. (Tr. 910). She described having poor energy post-COVID but was feeling much better physically and mentally. (*Id.*). She was compliant with Zoloft and described feeling better on the Zoloft. (*Id.*). On examination, she had euthymic mood and congruent affect, with intact insight and was not easily distracted. (Tr. 911). She was recommended to return for follow up in three months. (Tr. 912).

On November 22, 2021, Mertle treated with Gregory Parranto, M.D., complaining of continued left leg pain, coldness, and numbness and for follow up on her post-COVID fatigue. (Tr. 905-06). She described becoming fatigued quickly; her oxygen saturation was 98% at rest and dropped to 89% with a two-minute walk. (Tr. 907). On examination, she was generally not alert and oriented, although she had euthymic mood and was oriented to time, place, and person. (Tr. 907-08). Dr. Parranto advised her to continue using her home oxygen. (Tr. 907).

On December 15, 2021, Mertle presented to the emergency department with hypoxia; she expressed concern at her prolonged symptoms. (Tr. 298). She was alert and oriented to person,

3

place, and time, with normal mood and affect. (Tr. 300). A chest x-ray revealed no infiltrates or pulmonary edema. (Tr. 301). She was provided a prescription for prednisone and advised to follow up with her PCP for further management, and to consider a pulmonary consult due to her continued hypoxia. (*Id.*).

On December 27, 2021, Mertle met with Dr. Parranto complaining of struggling post-COVID and described having significant fatigue since having COVID-19 in September. (Tr. 469-70). On examination, she was oriented to time, place, and person, and had euthymic mood. (Tr. 472). Dr. Parranto referred Mertle for a sleep study for assessment of sleep apnea due to excessive daytime sleepiness. (Tr. 471-72).

In addition, the following records are available, from after the date last insured ("DLI").

On January 20, 2022, Mertle attended a cardiology consult with Zoheir Abdelbaki, M.D., where she was positive for chest tightness, chest pain, and shortness of breath. (Tr. 270). She was also negative for behavioral problems, confusion, decreased concentration, dysphoric mood, hallucinations, and self-injury. (*Id.*). She was diagnosed with precordial pain and shortness of breath, and Dr. Abdelbaki discussed cardiac catheterization. (Tr. 271).

On May 17, 2022, Dr. Parranto conducted a PHQ-9 assessment, in which Mertle described difficulty doing work, trouble concentrating, moving/speaking slowly,  and having low energy. (Tr. 869).

On June 2, 2022, Mertle underwent a sleep study. (Tr. 781). The study was conducted to follow up on Mertle's complaints of decreased memory, decreased concentration, excessive daytime sleepiness, which she reported had developed after COVID. (*Id.*). She was diagnosed with sleep apnea, COPD, morbid obesity, hypersomnia, and COVID-19 long hauler. (Tr. 783).

She was provided with a CPAP prescription and recommended to follow up six to eight weeks after set up. (*Id.*).

### C. Medical Opinion Evidence

Mertle's claim was evaluated by Abraham Mikalov, M.D., at the initial level on May 11, 2022, and no medically determinable impairment was found. (Tr. 65-68). On reconsideration on July 14, 2022, Lynne Torello, M.D., found that Mertle had medically determinable impairments including asthma and major depressive disorder. (Tr. 71). However, Dr. Torello found that Mertle's past COVID diagnosis was not a medically determinable impairment, and any symptoms from her medically determinable impairments were not alleged before her date last insured. (Tr. 72).

On January 6, 2023, Mertle underwent a neuropsychological evaluation conducted by Christi Trask, Ph.D. (Tr. 1379-86). She was referred for evaluation of reported memory trouble in the context of a history of COVID-19. (Tr. 1379). Mertle reported continuing to have, among other symptoms, shortness of breath, fatigue, numbness in her left leg, and cognitive difficulties such as memory trouble, difficulty concentrating, and mental confusion. (*Id.*). She described considerable difficulty with attention and information processing and easily losing her train of thought if interrupted; difficulty with word finding; and trouble expressing her thoughts. (*Id.*). She reported these symptoms were highly atypical and impacted her functioning and quality of life, noting an inability to return to work, needing to rely more heavily on note taking, and forgetting appointments. (*Id.*). She was otherwise able to complete her basic and instrumental activities of daily living independently. (Tr. 1379).

Dr. Trask noted a December 2022 brain MRI[1] showed "old infarct in the left cerebellar hemisphere inferiorly" but results were otherwise unremarkable. (*Id.*). Mertle began taking an antidepressant shortly before her COVID-19 infection, but denied current mood symptoms aside from mild anxiety. (Tr. 1380). She slept four to six hours per night with the use of a CPAP machine, and reported waking two to three times per night, feeling excessively tired during the day, and occasionally napping for a few hours. (*Id.*).

On examination, Mertle was oriented to person, place, time, and situation. (*Id.*). Her speech was fluent and no word finding difficulty was apparent. (*Id.*). She appeared motivated to perform and was generally able to understand test instructions without difficulty. (*Id.*). However, she occasionally became confused during tasks and her pattern of responses during a verbal recognition memory task was highly atypical and "likely reflected difficulty understanding task directions." (*Id.*).

Dr. Trask opined that Mertle demonstrated difficulties with several aspects of cognitive function, characterized by reduced verbal and visual encoding, poor verbal retrieval (with evidence of source memory difficulties) and variable benefit from cuing or repetition. (Tr. 1383). Attention and processing speeds were variable, as were executive functions; she had impaired confrontation naming. (*Id.*). Dr. Trask estimated Mertle had low average to average baseline intellectual abilities. (*Id.*).

Dr. Trask noted that the pattern of findings indicated cognitive difficulties across multiple domains, notably in learning, retrieval, and executive functions. (*Id.*). Dr. Trask diagnosed Mertle with unspecified mild neurocognitive disorder. (*Id.*). The etiology of Mertle's cognitive

---

[1] Although Dr. Trask references the MRI findings, the medical record does not disclose the December 2022 MRI.

problems was unclear, however, contributing factors may include long-term physical sequelae of COVID-19, including COPD and cardiovascular factors, sleep disturbance, and possible side effects of her current medications. (*Id.*). Dr. Trask indicated that the long-term cognitive sequelae of COVID-19 were unclear, but may contribute to the current cognitive symptoms, given Mertle's lack of reported functional difficulties prior to contracting COVID. (*Id.*). The history of left cerebellar infarct may also be associated with cognitive problems but would not fully account for Mertle's performance on testing. (*Id.*).

Dr. Trask noted that, due to her difficulties in executive functioning, Mertle may have greater trouble with novel or more complex tasks; she recommended Mertle limit the need for rapid information processing, complete one task at a time, and employ compensatory strategies to aid in remembering tasks. (Tr. 1384-85). She may need to break complex problems into smaller steps to limit the demands placed on her working memory at any given time. (Tr. 1385). To address problems related to reduced speed of information processing, Dr. Trask recommended scheduling more difficult activities for a time of day where Mertle is most alert, allowing more time for comprehending, processing, and responding in conversation, and having others alter the rate of presentation when giving Mertle instructions. (*Id.*).

### D. Administrative Hearing Evidence

Mertle testified that she became unable to work on September 15, 2021, after contracting COVID-19. (Tr. 38). She was hospitalized on September 28, 2021, with fever, chills, and difficulty breathing. (*Id.*). She was in the hospital for two and a half days and was discharged with three liters of home oxygen, which she wore for about three months after discharge. (*Id.*). She now treats with a pulmonologist and uses two inhalers, a rescue inhaler and a daily inhaler.

(Tr. 39). She estimated her oxygen remained at 92-94. (Tr. 50). She uses a CPAP machine at night. (Tr. 47).

Mertle lived with a roommate. (Tr. 49). She has difficulty with stairs; she uses all four limbs to crawl up the stairs and must rest halfway and at the top. (*Id.*). She had childhood asthma, which returned due to COVID. (Tr. 50).

She testified she was able to do about five minutes of vacuuming or yard work before needing to rest and use her inhaler. (Tr. 39-40). She was healthy prior to contracting COVID, and now has eight medications to treat her heart and pulmonary conditions. (Tr. 40-43). She has to use her rescue inhaler daily after she makes her bed in the morning. (Tr. 43). She underwent a pulmonary function test administered by her pulmonologist in April 2022, and had another scheduled for May 2023. (Tr. 45-46). She had been in pulmonary rehab for three months, attending twice per week. (Tr. 46). She could walk on the treadmill for 15 minutes while in rehab but would become exhausted after. (Tr. 47). After resting, she would then do ten minutes on the exercise bike. (*Id.*).

Mertle also complained of unexplained numbing in her left leg after being discharged from the hospital. (Tr. 48). She returned to the hospital because it may have been a blood clot, but no clot was found. (*Id.*). Since that time, she has had daily cold and numbness in her left thigh, which sometimes results in her falling. (Tr. 48-49). Her doctors have been unable to diagnose the source of her numbness. (Tr. 49).

She described ongoing post-COVID effects including memory loss. (Tr. 52). Her pulmonologist referred her to a neurologist who conducted an MRI but was unable to explain certain findings. (Tr. 52-53). This neurologist referred her to another doctor in Columbus who specialized in memory issues. (Tr. 52). She recently underwent testing with the doctor in

Columbus but had not received the results at the time of the hearing. (*Id.*). She now needs to write everything down, including daily tasks, due to memory issues. (Tr. 55).

Mertle had previously worked in a family-owned grocery store and did ordering, stocking, and cashiering. (Tr. 53). She also performed in-home care for the elderly, assisting with grocery shopping, personal care, and other daily needs. (Tr. 54). She was required to lift up to 20 pounds in this job, and occasionally catch a client if they started to fall. (*Id.*).

The VE then testified. The VE identified Mertle's past relevant work as home attendant, DOT 354.377-014, SVP 3, medium per the DOT, but light as performed; and cashier/checker, DOT 211.462-014, SVP 3, light per the DOT, but medium as performed. (Tr. 58-59).

The ALJ presented the following hypothetical: light work, no climbing of ladders and scaffolds, occasional stairs, and remaining postural activities on a frequent basis; frequent handling and fingering, overhead reaching, and pushing and pulling; no hand and foot controls; no assembly line work dictated by an external source; no dangerous machinery, unprotected elevations, extreme temperatures, or commercial driving; understanding, remembering, and carrying out simple instructions that require little or no judgment and a short period of time to learn. (Tr. 59). The VE responded that the hypothetical individual could perform the following occupations: marker, DOT 209.587-034, SVP 2, light, with 110,000 jobs in the national economy; mail clerk, DOT 209.687-026, SVP 2, light, with 18,000 jobs in the national economy; and inspector and hand packager, DOT 559.687-074, SVP 2, light, with 50,000 jobs in the national economy. (Tr. 59-60).

The second hypothetical modified the postural limitations to no climbing ladders and scaffolds, and only occasional for the remaining postural limitations. (Tr. 60). The VE testified that the three jobs previously identified would remain. (*Id.*). The third hypothetical would have

frequent handling and fingering, but occasional overhead reaching, pushing, and pulling. (*Id.*). The VE again testified that the three jobs identified would remain without any reduced numbers. (*Id.*).

Finally, the VE testified that employees are permitted two 15-minute breaks and one 30-minute meal period, planned typically by two-hour work periods; the employee is expected to remain on task 90% of the day. (*Id.*). Most employers will tolerate one absence per month but not on a consistent basis, and both arriving late and leaving early constitute as absences. (Tr. 61). During the probationary period lasting 30 to 90 days, there is typically zero tolerance for absences. (*Id.*).

## IV.    The ALJ's Decision

On May 24, 2023, the ALJ issued the following decision:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2021.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of September 15, 2021 through her date last insured of December 31, 2021 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: long-COVID; COPD; sleep apnea; morbid obesity; depression; and neurocognitive disorder (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except frequent handling and fingering, frequent overhead reaching, pushing or pulling, no hand or foot controls, no climbing ladders and scaffolds and engaging in the remaining postural activities on a frequent basis in environments with no assembly line production dictated by an external source, no dangerous machinery, no unprotected elevations, no extreme temperatures and no commercial driving. In addition, the claimant can understand and remember simple

10

instructions that require little or no judgment and a short period of time to learn.

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on April 30, 1969 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.      The claimant has at least a high school education (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from September 15, 2021, the alleged onset date, through December 31, 2021, the date last insured (20 CFR 404.1520(g)).

(Tr. 19-30).

## V.    Law & Analysis

### A.    Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

2.      if not, whether the claimant has a severe impairment or combination of impairments;

3.      if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.      if not, whether the claimant can perform their past relevant work in light of his RFC; and

11

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

## B.      Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error

12

was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI.     Discussion

Mertle brings one issue for this Court's consideration: whether the ALJ's RFC determination is unsupported by substantial evidence and is the product of legal error because the ALJ improperly evaluated the opinion of her examining provider, Dr. Trask. (ECF Doc. 8, p. 3). Although Mertle raises the ALJ's error as one issue, the alleged errors with the opinion evidence and the RFC are distinct and I address each in turn.

### A.     The ALJ did not err in her consideration of Dr. Trask's opinion.

Mertle alleges the ALJ failed to adequately explain her consideration of Dr. Trask's opinion. (ECF Doc. 8, pp. 8-13). Mertle alleges that the reasons given by the ALJ were not supported by the record, that her rationale for considering the opinion was contradictory to the reasons she gave for discounting Dr. Trask's opinion and other opinions of record, and that the

13

ALJ's consideration of the supportability factors were not properly discussed. (*Id.*). The Commissioner asserts that Mertle has failed to satisfy her burden of demonstrating disability, and that the ALJ's consideration of Dr. Trask's opinion is supported by substantial evidence. (ECF Doc. 10, pp. 7-12). The Commissioner contends that the ALJ's consideration of Dr. Trask's post-DLI opinion evidence was in accordance with Sixth Circuit precedent, and Mertle's contentions otherwise are unfounded. (*Id.*). Finally, the Commissioner argues that, as to the "supportability" of Dr. Trask's opinion, the ALJ invoked the lack of supportability by referencing the fact that the opinion was rendered outside of the relevant period, and that Dr. Trask's failure to definitively trace Mertle's memory issues to long COVID "spoke to the supportability of the opinions." (*Id.* at pp. 11-12).

I do not find reversible error with the ALJ's statements regarding the remote nature of Dr. Trask's opinion outside of the DLI and her reference to the lack of confirmation that Mertle's memory issues were due to long COVID.

Before reaching Step Four of the sequential analysis laid out in the regulations, the ALJ determines a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). According to the regulations, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical

14

source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520c(c)(1)-(2). Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

In her decision, the ALJ provided extensive description covering the contents of Dr. Trask's opinion. (Tr. 27). The ALJ provides a full description of Dr. Trask's findings supportive of memory issues and included an overview of the tests Dr. Trask performed to support her opinion of memory issues and diagnosis of Unspecified Mild Neurocognitive Disorder. The ALJ provides the following description to explain her reasoning for failing to find Dr. Trask's opinion fully persuasive:

> This opinion is not totally persuasive as this examination was completed well after the date last insured and the examiner could not yet confirm if the diagnosis of mild neurocognitive disorder was COVID related. However, the notation that the claimant had difficulty with memory is supported as it is consistent with and supported by the medical evidence of record, including her testimony. (Exhibit 3E and Hearing testimony).

(Tr. 27).

Although the ALJ is not required to use the 'magic words' of "supportability" and "consistency" when describing their reasoning, the ALJ must still provide sufficient reasoning, scaffolded with references in the medical record to support their decision, enough for a subsequent reviewer to trace the lines of their reasoning. *Lawrence v. Comm'r of Soc. Sec.*, No. 1:21-CV-01691-JG, 2023 WL 2246704, at *20 (N.D. Ohio Jan. 19, 2023), *report and recommendation adopted*, No. 1:21-CV-01691, 2023 WL 2242796 (N.D. Ohio Feb. 27, 2023) ("Although the ALJ did not use the term supportability or consistency in the above evaluation,

15

the ALJ made findings relative to the opinion related to supportability and consistency."). Although the ALJ references the terms of "supportability" and "consistency" in general terms (Tr. 27), I find she has provided sufficient description of her determination to permit my review. Here, the ALJ provides that she found Dr. Trask's opinion unsupported because (1) it was rendered "well after the date last insured" and (2) because Dr. Trask was not definitive in connecting her diagnosis of mild neurocognitive disorder with the effects of long COVID. (*See id.*). This explanation is enough to meet the regulations. Likewise, the ALJ described the consistency of Dr. Trask's opinion with other evidence, and determined that it was consistent with Mertle's own subjective symptoms. Again, this is enough to meet the regulations' requirement to describe a medical opinion in consistency terms. I determine the ALJ has properly described her consideration of Dr. Trask's opinion according to the regulations and therefore recommend the District Court affirm.

**B.     Mertle raises no reversible error with respect to the RFC determination.**

I next turn to Mertle's assertion that the ALJ's RFC determination is unsupported by substantial evidence and recommend the District Court affirm the Commissioner with respect to this issue. Mertle focuses much of her brief on the ALJ's assessment of Dr. Trask's opinion evidence, and provides the following in support of her argument for more restrictive limitations:

> In constructing the RFC, the ALJ only provided one nonexertional limitation: "[Plaintiff] can understand and remember simple instructions that require little or no judgment and a short period of time to learn." T 23. However, Dr. Trask's opinion and findings (discussed in detail at *supra* pp. 3-6), as well as other evidence in the record provide for more limiting and occupationally preclusive restrictions such as additional breaks.

(ECF Doc. 8, p. 13). The Commissioner does not specifically respond to this assertion.

Before proceeding to Step Four of the sequential analysis, the ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e).

16

The RFC is an assessment of a claimant's ability to work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p. "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 61 Fed. Reg. 34474, 34475 (1996). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p.

Despite Mertle's brief contention otherwise, an ALJ is not obligated to incorporate a medical opinion into an RFC. *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). This is because the Social Security Act instructs that the ALJ, not a doctor, determines the RFC. *See Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010). An RFC determination is a legal decision rather than a medical one, and the development of a claimant's RFC is solely within the province of an ALJ. *See Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009).

Therefore, the ALJ was not required to incorporate Dr. Trask's opinions into her RFC determination. I find no reversible error and recommend the District Court affirm.

## VII.    Recommendation

Because the ALJ properly applied the legal standards when describing her consideration of Dr. Trask's opinion and when forming the RFC, I recommend that the Commissioner's final decision denying Mertle's application for disability insurance benefits be affirmed.


Dated: December 19, 2024

Reuben J. Sheperd
United States Magistrate Judge

17

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).